621 F.2d 940
 6 Fed. R. Evid. Serv. 283
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jerome P. LUTZ, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Jack D. STEWART, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Perry A. WHITE, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Larry ZITEK, Defendant-Appellant.
 Nos. 78-2969, 78-2978, 78-2970 and 78-3008.
 United States Court of Appeals,
Ninth Circuit.
 May 9, 1980.
 
 David S. Teske, Des Connell, Susan Elizabeth Reese, Tommy Hawk, Portland, Or., for defendants-appellants.
 William Otis, Atty., U. S. Dept. of Justice, Washington, D. C., argued, Louis M. Fischer, Washington, D. C., on brief, for plaintiff-appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before KILKENNY and WALLACE, Circuit Judges, and JAMESON,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 Lutz, Stewart, White, and Zitek appeal their convictions for mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 2. We affirm.
 
 I.
 
 2
 In October 1975, Stewart and Lutz organized Nation-Wide Funding, Inc. (Nation-Wide), a loan-brokerage firm whose advertised goal was to find financial backing for high-risk borrowers. The evidence at trial established that Nation-Wide personnel obtained thousands of dollars in advance fees from prospective borrowers by promising instant or virtually guaranteed funding for the borrowers' projects, even though the Nation-Wide personnel knew that there was no chance of securing any funding. These fraud convictions resulted.
 
 
 3
 Stewart was Nation-Wide's President and Lutz its Vice-President. At various times during 1975, 1976, and 1977, Nation-Wide employed White, Zitek, David Haner, John Blay, and others as "loan officers" or salesmen.[1]
 
 
 4
 Nation-Wide obtained its clients principally through advertisements placed in the Wall Street Journal. Prospective borrowers who responded to these advertisements normally received a brochure written by Stewart and Lutz, which, among other things, "pledge(d)" to "only undertake assignments for which, in our opinion, there is a reasonable chance of funding." The brochure directed prospective borrowers to write, call, or wire Nation-Wide "to get acquainted."
 
 
 5
 Persons who responded to the brochure's appeal were next contacted by one of Nation-Wide's "loan officers." The "loan officer" routinely suggested an on-site inspection of the client's project to determine its suitability for funding. Nation-Wide charged the client for the "loan officer's" round-trip air fare, meals, and lodging. After the on-site inspection confirmed that the project was "viable," Nation-Wide charged an additional $2,500 to $2,700 for services rendered by the loan officer during the on-site visit to the project, Nation-Wide's preparation of a loan package for the client, and Nation-Wide's efforts in marketing this package to prospective lenders.
 
 
 6
 Nation-Wide had virtually no success in obtaining loan commitments for its clients. In its entire operation, Nation-Wide obtained only one funding, in May 1977, less than two months before the grand jury returned its indictment. The government's proof demonstrated that Stewart, Lutz, White, Zitek, and other Nation-Wide employees induced prospective borrowers to pay advance fees by misrepresenting Nation-Wide's past and anticipated achievements in obtaining client fundings, the type and terms of Nation-Wide's funding sources, Nation-Wide's ability to obtain large sums of money very quickly, and the expertise of Nation-Wide personnel. The government's witnesses included 35 individuals who contended that they had been bilked of amounts ranging from $1,500 to $2,750 and totaling over $67,000. They testified to oral and written misrepresentations by Stewart and Lutz, and oral misrepresentations by White, Zitek, Haner, and other "loan officers" during their on-site inspections.
 
 
 7
 The government also demonstrated that Stewart and Lutz, as part of the Nation-Wide scheme, referred clients to other mortgage brokers as primary loan sources notwithstanding that these brokers, like Nation-Wide, had no funds to lend. These referred brokers, in turn, demanded additional fees from Nation-Wide's clients. 15 government witnesses testified that they had received referral letters to a firm called London Investors. Other referred brokers included Citation Mortgage, and Underhill Associates.
 
 II.
 
 8
 None of the defendants challenges the sufficiency of the evidence produced at trial. All argue, however, that the government's proof demonstrated the existence of several independent schemes, rather than the single, unitary scheme charged in the indictment. They contend that this constituted a prejudicial variance between the indicted offenses and the proof at trial. See, e. g., Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).
 
 
 9
 Although the indictment in this case charges a multi-party mail and wire fraud instead of a conspiracy, we may still rely on the principles governing variance in conspiracy cases. See United States v. Serlin, 538 F.2d 737, 746 (7th Cir. 1976); Friedman v. United States, 347 F.2d 697, 708 (8th Cir.), cert. denied, 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354 (1965). We have held in conspiracy cases that the existence of a unitary scheme matching that charged in the indictment is a question for the jury. United States v. Thomas, 586 F.2d 123, 132 (9th Cir. 1978). We apply the same rule here. Thus, if the jury could rationally have found that Stewart, Lutz, White, and Zitek engaged in a unitary mail or wire fraud scheme, there is no prejudicial variance. See, e. g., id. at 131-32; United States v. Perry, 550 F.2d 524, 531 (9th Cir.), cert. denied, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 228, 434 U.S. 827, 98 S.Ct. 104, 54 L.Ed.2d 85 (1977).
 
 
 10
 We think there was ample evidence before the jury to support a finding that the defendants were engaged in a common scheme. The defendants particularly complain about the introduction of evidence relating to Nation-Wide's use of outside brokers, such as Underhill Associates and Citation Mortgage. But the involvement of these brokers materially aided the overall scheme by convincing clients that their loan packages were being aggressively marketed and referred to potential lenders. Clients were directed to keep Nation-Wide personnel advised of their subsequent dealings with these brokers. The impression given was that the referral was an important aspect of Nation-Wide's comprehensive funding strategy, and a significant step toward attaining funding. This false impression reinforced and perpetuated the defendants' previous misrepresentations.
 
 
 11
 The defendants urge similar prejudicial variance in the receipt of (1) evidence of Lutz's and Zitek's participation in Eleven-West Mortgage and Investment Co. (Eleven-West), a separate loan-brokerage enterprise previously the subject of indictments and convictions for mail fraud, and (2) testimony regarding White's participation in the formation and operation of All-States Funding, Inc. (All-States), whose activities have since been the subject of an indictment. But the evidence of the fraudulent fee scheme developed at Eleven-West was admitted pursuant to Fed.R.Evid. 404(b) to demonstrate Lutz's and Zitek's knowledge and intent regarding the fee structure at Nation-Wide. Similarly, evidence of fraudulent activity at All-States was probative of White's intent in his dealings with Nation-Wide customers.
 
 
 12
 At the close of trial, the district court instructed the jury to the effect that it had to find a single scheme at Nation-Wide involving each of the defendants it would convict. This instruction eliminated any confusion which might have arisen in the government's attempt to make sense out of a complex fraud. See, e. g., United States v. Griffin, 464 F.2d 1352, 1357 (9th Cir.), cert. denied, 409 U.S. 1009, 93 S.Ct. 444, 34 L.Ed.2d 302 (1972). Because there was sufficient evidence before the jury to support its finding that the single fraudulent scheme alleged in the indictment existed, and because the jury received appropriate instructions, we find that the proof at trial did not constitute a prejudicial variance from the offenses charged in the indictment.
 
 III.
 
 13
 White urges that the district court abused its discretion in admitting the evidence regarding his participation in All-States. White claims that the prejudicial impact of this evidence outweighed its probative value.
 
 
 14
 At the beginning of trial, in response to various in limine motions objecting to the introduction of evidence concerning All-States, the government maintained that such evidence was admissible to show White's and Haner's participation in a fraudulent scheme similar to that charged in the indictment against Nation-Wide, as probative of their motive and intent while at Nation-Wide. The district court permitted the government to introduce the All-States evidence for this purpose.
 
 
 15
 At the close of the government's proof, the court granted Haner's motion for severance. See note 1 supra. Upon Haner's severance, the government moved to strike all of the All-States exhibits and testimony. The court did not immediately act upon the government's motion. Later in the trial, counsel for Lutz offered two witnesses who testified concerning All-States during cross-examination by the government. White objected to the eliciting of this evidence on cross-examination and moved to strike all references in the case to All-States, on the grounds that activities at All-States were irrelevant to issues in the Nation-Wide case, and additionally that the government's motion to strike all of the All-States testimony and exhibits was still pending. The court denied White's motion. Subsequently, the government indicated to the court that "we have . . . changed our minds with respect to the All-States Funding offer to strike we are reconsidering, we have now reconsidered our position and if someone once said we have waffled on the matter, we have." At the close of trial, White again moved to exclude the All-States evidence. The court denied this motion, although it did explicitly instruct the jury that the All-States evidence could only be considered with respect to White, and only as probative of White's motive or intent while at Nation-Wide.
 
 
 16
 Evidence submitted pursuant to Fed.R.Evid. 404(b) is subject to the relevancy criteria of Rule 403. United States v. Sangrey, 586 F.2d 1312, 1314 (9th Cir. 1978). Accordingly, the trial court must determine whether the prejudicial impact of particular evidence is outweighed by its probative value. Fed.R.Evid. 403. This determination lies within the trial court's discretion. United States v. Hearst, 563 F.2d 1331, 1336 (9th Cir. 1977) (per curiam), cert. denied, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). The question on appeal, therefore, is whether the district court abused its discretion by determining that the probativeness of the All-States evidence, to show White's intent and motive in his activities at Nation-Wide, outweighed its prejudicial impact. See, e. g., United States v. Rocha, 553 F.2d 615, 616 (9th Cir. 1977) (per curiam); United States v. Brashier, 548 F.2d 1315, 1325 (9th Cir. 1976), cert. denied, 429 U.S. 1111, 97 S.Ct. 1149, 51 L.Ed.2d 565 (1977).
 
 
 17
 We find no abuse of discretion. As we indicated in Part II, evidence of White's activities at All-States clearly bore on his motive and intent while at Nation-Wide. The district court cautioned the jury to consider the evidence only for this purpose. These instructions minimized any prejudice which White might have suffered from the admission of this evidence.
 
 
 18
 White additionally contends that the district court violated his privilege against self-incrimination by refusing to rule, in limine, that if White testified the scope of cross-examination would be limited to matters not involving All-States. Because a grand jury investigation of All-States was proceeding during the Nation-Wide trial, White urges that he was unconstitutionally faced with the choice of incriminating himself concerning his activities at All-States or remaining silent at the Nation-Wide trial.
 
 
 19
 We rejected a similar argument in United States v. Hearst, supra, 563 F.2d 1331. Proceeding from the established proposition that a defendant's difficult choice between remaining silent at trial and presenting a defense does not itself constitute an invasion of the privilege against compelled self-incrimination, Williams v. Florida, 399 U.S. 78, 84, 90 S.Ct. 1893, 1897, 26 L.Ed.2d 446 (1970), we stated:
 
 
 20
 (W)hen a defendant takes the witness stand, "his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination." Brown v. United States, (356 U.S. 148, 154-55, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958)). "(A) defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination." McGautha v. California, 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971).
 
 
 21
 563 F.2d at 1340. We thus held in Hearst that it was not error for the district court to deny the defendant's in limine motion, made at the conclusion of her direct testimony, to limit the scope of cross-examination. Id. at 1338-42.
 
 
 22
 The logic of Hearst applies here. White's choice between remaining silent and testifying may have been difficult, but his Fifth Amendment privilege was not thereby invaded. The pending grand jury investigation may have sharpened the dilemma's horns, but White's choice remained identical in kind to that faced by all defendants in criminal trials. If White had testified, cross-examination concerning White's involvement in All-States would clearly have been permissible on the issues of White's intent and credibility. Thus, the district court's refusal to limit the scope of White's cross-examination did not violate White's constitutional privilege. Furthermore, the admitted evidence was well within the scope of permissible questioning. White's contentions are meritless.
 
 IV.
 
 23
 Stewart, Lutz, White, and Zitek assert that the trial court abused its discretion in failing to grant their mid-trial motions for severance. As we have discussed, see note 1 supra, defendants Blay and Haner were severed, but the remaining defendants' motions for severance were denied.
 
 
 24
 A motion for severance is addressed to the trial court's discretion, and a defendant bears a heavy burden in attempting to show that the trial court abused that broad discretion. United States v. Brady, 579 F.2d 1121, 1127-28 (9th Cir.), cert. denied, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1978); United States v. McDonald, 576 F.2d 1350, 1355-56 (9th Cir.), cert. denied, 439 U.S. 830, 927, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978).
 
 
 25
 The burden of proving this prejudice is a difficult one and the ruling of the trial judge will rarely be disturbed. It is not sufficient that a separate trial might offer a defendant a better chance of acquittal. Rather, the ultimate question is whether under all of the circumstances, it is within the capacity of the jurors to follow the court's admonitory instructions and, correspondingly whether they can collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements, and conduct.
 
 
 26
 United States v. Brady, supra, 579 F.2d at 1127-28. See United States v. Kaplan, 554 F.2d 958, 967 (9th Cir.), cert. denied, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977).
 
 
 27
 The district court instructed the jury at the close of trial to give separate consideration to each defendant. That the jury complied with this admonition and successfully compartmentalized the evidence is demonstrated by its differentiation among the defendants regarding the counts on which each was convicted. See United States v. Kaplan, supra, 554 F.2d at 967. We think the court's instructions were sufficient to avoid any prejudice to the defendants from their joint trial. See United States v. Smith, 609 F.2d 1294, 1301 (9th Cir. 1979); United States v. McDonald, supra, 576 F.2d at 1356 n.8; United States v. Cozzetti, 441 F.2d 344, 349 (9th Cir. 1971).
 
 
 28
 Lutz separately argues that Stewart sought to shift all of the blame to him when he testified that he, Stewart, was very ill for a large portion of the period covered by the indictment and lacked the expertise to run Nation-Wide. Lutz also complains of the admission of testimony concerning Lutz's relationship with Stewart's wife. We have said, however, "(c)onflicting and antagonistic defenses being offered at trial do not necessarily require granting a severance, even if hostility surfaces or defendants seek to blame one another." United States v. Brady, supra, 579 F.2d at 1128. The district judge instructed the jury that evidence pertaining to Lutz's relationship with Stewart's wife could be considered only as probative of Stewart's state of mind and his possible motives as a witness. We are satisfied that this instruction eliminated any meaningful prejudice to Lutz.
 
 V.
 
 29
 Stewart argues that the district court committed reversible error by admitting certain out-of-court statements into evidence pursuant to the coconspirator exception to the hearsay rule, Fed.R.Evid. 801(d)(2)(E). Stewart does not identify which particular testimony he considers objectionable, but the record reveals that at least three government witnesses testified concerning out-of-court representations made to them by White.
 
 
 30
 The district court repeatedly instructed the jury that the out-of-court statements attributed to White could be considered only against him and were thus "inapplicable" to any other defendant. In his final instructions to the jury, however, the district judge substituted the following for the limiting instructions given during the presentation of evidence:
 
 
 31
 In determining whether or not a defendant was a party to or member of (the) common plan or arrangement (charged in the indictment), the jury are not to consider what others may have said or done. That is to say, the membership of a defendant in such a common plan or arrangement must be established by evidence as to his own conduct, what he himself knowingly said or did.
 
 
 32
 If and when it appears beyond a reasonable doubt from the evidence in the case that such a common plan or arrangement did exist and that a defendant was one of the members of the plan or arrangement, then the act and statements by any other defendant likewise found to be a member may be considered by the jury as evidence in the case as to the defendant found to have been a member, even though the acts and statements may have occurred in the absence and without the knowledge of the defendant, provided such acts and statements were knowingly done and made during the continuance of the common plan or arrangement and in furtherance of some intended object or purpose of the plan or arrangement.
 
 
 33
 None of the defendants objected to this final instruction. The government did object, however, urging that the jury need not be instructed to find beyond a reasonable doubt that a "common plan or arrangement" existed before it could consider the out-of-court statements against all of the codefendants. See United States v. Giese, 597 F.2d 1170, 1197-98 (9th Cir.), cert. denied, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979).[2]
 
 
 34
 Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that "a statement by a coconspirator . . . during the course and in furtherance of the conspiracy" is not hearsay when offered against another conspirator. In discussing the use of 801(d)(2)(E) in conspiracy cases, we have said:
 
 
 35
 (C)oconspirator hearsay is admissible only when a foundation is laid to show that: (1) the declaration was in furtherance of the conspiracy, (2) it was made during the pendency of the conspiracy, and (3) there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant to it.
 
 
 36
 United States v. Weiner, 578 F.2d 757, 768 (9th Cir.) (per curiam), cert. denied, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978). Out-of-court statements by coparticipants in a mail or wire fraud scheme are admissible according to the same rules. United States v. Toney, 605 F.2d 200, 207-08 (5th Cir. 1979); United States v. Krohn, 573 F.2d 1382, 1386-87 (10th Cir.), cert. denied, 436 U.S. 949, 98 S.Ct. 2857, 56 L.Ed.2d 792 (1978); United States v. AMREP Corp., 560 F.2d 539, 545 (2d Cir. 1977), cert. denied, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978). Thus, even though the participants in the Nation-Wide scheme were not charged with conspiracy, their out-of-court acts or statements, if made during and in furtherance of the scheme, were admissible against coparticipants upon independent proof that both the declarant and the party against whom the evidence was offered were members of a common scheme or plan.
 
 
 37
 Stewart urges that the district court erred in failing to make an explicit finding that the coparticipants' out-of-court statements were admissible under the foregoing criteria before submitting this evidence to the jury. Stewart correctly asserts that the "trial judge (must) make( ) the initial determination whether a sufficient foundation has been established to make the (out-of-court) declarations admissible." United States v. Watkins, 600 F.2d 201, 204 (9th Cir.), cert. denied, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); United States v. Eubanks, 591 F.2d 513, 519 (9th Cir. 1979) (per curiam); Carbo v. United States, 314 F.2d 718, 737 (9th Cir. 1963), cert. denied, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). But we have not required the trial court to make an explicit finding that a coconspirator's statements are admissible. See, e. g., United States v. Giese, supra, 597 F.2d at 1198, and cases cited therein. "Submission of the case to the jury, with instructions that it can consider co-conspirators' statements, is an indication that the court has found independent evidence establishing a prima facie case. We will not find error unless the evidence is insufficient." Id.; see United States v. Watkins, supra, 600 F.2d at 205.
 
 
 38
 Here there was plainly sufficient evidence, independent of the acts and statements of coparticipants in the scheme, to supply a foundation for the admission of the out-of-court statements. Indeed, Stewart does not contend otherwise. Although the district court might have ruled explicitly that the statements were admissible before submitting them as evidence to the jury, the district court's tacit finding was sufficient.
 
 VI.
 
 39
 Zitek argues that the admission into evidence of an apologetic letter written by Lutz to a defrauded client, in which Lutz indicated that Zitek had been fired because of "promises made in the field to clients," denied Zitek his Sixth Amendment right to confront adverse witnesses. See Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The government concedes that Bruton error occurred, but argues that admission of the offending letter was harmless beyond a reasonable doubt.
 
 
 40
 Bruton violations do not require automatic reversal. See Schneble v. Florida, 405 U.S. 427, 430, 92 S.Ct. 1056, 1058, 31 L.Ed.2d 340 (1972); Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); United States v. Longee, 603 F.2d 1342, 1345 (9th Cir. 1979); United States v. Cornejo, 598 F.2d 554, 557 (9th Cir. 1979); United States v. Vissars, 596 F.2d 400, 403-04 (9th Cir. 1979). "In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." Schneble v. Florida, supra, 405 U.S. at 430, 92 S.Ct. at 1059. See Parker v. Randolph, 442 U.S. 62, 70-71, 99 S.Ct. 2132, 2137-2138, 60 L.Ed.2d 713 (1979) (opinion of Rehnquist, J.).
 
 
 41
 Our consideration of the record indicates that the Bruton violation here was harmless beyond a reasonable doubt. Five or six of the individuals to whom Zitek made false promises testified at trial, including Mr. Nix, the recipient of Lutz's letter. The assertions contained in the letter were therefore cumulative, and provided the jury with no new information. See United States v. Vissars, supra, 596 F.2d at 404. The evidence of Zitek's guilt independent of the letter was overwhelming. The Bruton error, being harmless beyond a reasonable doubt, does not require reversal.
 
 VII.
 
 42
 Stewart, Lutz, White, and Zitek argue that the district court erred in failing to compel production of notes taken by a federal prosecutor during an interview with a witness, Cowell, who testified at trial. Defendants contend that they were entitled to these notes pursuant to the Jencks Act, 18 U.S.C. § 3500.
 
 
 43
 The government concedes that, after Goldberg v. United States, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603 (1976), "a writing prepared by a Government lawyer relating to the subject matter of the testimony of a Government witness that has been 'signed or otherwise adopted or approved' by the Government witness is producible under the Jencks Act . . . ." Id. at 98, 96 S.Ct. at 1342. It further concedes that once Cowell testified, during cross-examination by counsel for Zitek, that the government attorney who interviewed Cowell did take notes, the district judge committed error when he failed to conduct an inquiry to determine whether Cowell "adopted or approved" these notes. The government argues, however, that even if the district judge made proper inquiry and found that the notes should have been produced pursuant to the Jencks Act, any error was harmless.
 
 
 44
 "As the Jencks Act is not constitutionally required, we need not find the error harmless beyond a reasonable doubt in order to uphold the convictions." United States v. Carrasco, 537 F.2d 372, 377 n.3 (9th Cir. 1976). See United States v. Augenblick, 393 U.S. 348, 356, 89 S.Ct. 528, 533, 21 L.Ed.2d 537 (1969). We have found harmless error in such circumstances when a defendant's guilt is established beyond a reasonable doubt by competent testimony other than that tainted by the Jencks Act violation. E. g., United States v. Calhoun, 542 F.2d 1094, 1103-04 (9th Cir. 1976), cert. denied, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977). Thus, when the tainted testimony is simply cumulative, and "not crucial or vital to the Government's case," we will not reverse. United States v. Phillips, 482 F.2d 1355, 1357 (9th Cir. 1973) (per curiam), cert. denied, 419 U.S. 847, 95 S.Ct. 2680, 45 L.Ed.2d 709 (1974), quoting Kane v. United States, 431 F.2d 172, 175 (8th Cir. 1970).
 
 
 45
 Cowell was only one of 35 victims of the Nation-Wide scheme who testified at trial, and only one of seven who testified concerning Zitek's misrepresentations. There was abundant untainted evidence that the various defendants participated in a fraudulent scheme. On these facts, any error in the failure to produce Jencks Act materials was harmless.
 
 VIII.
 
 46
 Lutz and Stewart contend that the attorney who jointly represented them at the time of their grand jury appearances was incompetent and had a clear conflict of interest in representing both defendants. Their allegations concerning the adequacy and propriety of counsel's representation before the grand jury rely largely on facts beyond the record. We therefore cannot decide the issue in this proceeding. See United States v. Gomez, 523 F.2d 185, 186 (9th Cir. 1975), cert. denied, 423 U.S. 1075, 96 S.Ct. 859, 47 L.Ed.2d 85 (1976); Lustiger v. United States, 386 F.2d 132, 142 (9th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1042, 19 L.Ed.2d 1142 (1968).[3]
 
 IX.
 
 47
 Finally, all of the defendants argue that certain documents that were subpoenaed from Nation-Wide were improperly admitted into evidence pursuant to the business records exception. Fed.R.Evid. 803(6). The government responds by pointing out that the defendants were the declarants on the vast majority of the Nation-Wide documents. Defendants do not identify any particular documents as being erroneously admitted, nor do they demonstrate any actual prejudice resulting from the admission of any of these documents. Under these circumstances, we find no grounds for reversal.
 
 
 48
 AFFIRMED.
 
 
 
 *
 Honorable William J. Jameson, United States District Judge, District of Montana, sitting by designation
 
 
 [1]
 Both Haner and Blay were indicted in the case now before us. Blay was severed from trial on the government's motion during a pre-trial hearing. Haner was severed at the close of the government's proof. In each case severance was granted because of these defendants' short periods of involvement with Nation-Wide, and the relatively few counts of the indictment in which they were charged
 
 
 [2]
 The instruction given by the trial court was taken from 2 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 27.06 (3d ed. 1977). That suggested instruction has since been withdrawn from Devitt and Blackmar, see id. (Supp.1980), because of decisions, e. g., United States v. Giese, 597 F.2d 1170, 1197 (9th Cir. 1979), which indicate that once the trial judge determines to admit an out-of-court coconspirator statement pursuant to Fed.R.Evid. 801(d) (2)(E), the jury need not be instructed to redetermine whether the statement is admissible. After Giese, the instruction given in this case was surplusage, and the government's objection to it was well taken. Giving the instruction was not reversible error, however, since it simply afforded the defendants unnecessary double protection: hearings before both the court and the jury. See United States v. Noll, 600 F.2d 1123, 1128 (5th Cir. 1979)
 
 
 [3]
 During oral argument counsel for Stewart conceded that his client's claim of ineffective assistance of counsel before the grand jury would more appropriately be brought in an action pursuant to 28 U.S.C. § 2255. We of course intend no comment on the merits of this claim