UNITED STATES of America,
Plaintiff-Appellee,

v.

Raymond DeROSA, Defendant-Appellant,

Alfred Ponticelli, Defendant-Appellant,

Danny DeSantis, Defendant-Appellant,

Phil Bertman, Defendant-Appellant.

Nos. 80–1668, 80–1670 to 80–1672.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 1981.

Decided March 4, 1982.

Rehearing Denied April 19, 1982.

Stephen Stein, Las Vegas, Nev., for De-Rosa.

Joseph F. Walsh, Beverly Hills, Cal., on brief, for Ponticelli.

Stanley I. Greenberg, Los Angeles, Cal., for DeSantis.

Arthur Mabry, Los Angeles, Cal., for Bertman.

Before ANDERSON and NORRIS, Circuit Judges, and ENRIGHT,* District Judge.

NORRIS, Circuit Judge.

While conducting a two year undercover operation, Drug Enforcement Agency

* The Honorable William B. Enright, United States District Judge, Southern District of California, sitting by designation.

(DEA) Special Agent Ruddy Bareng and DEA informant David Blinder participated in several narcotics transactions involving the defendants. After Bareng and Blinder testified before a grand jury, a nine count indictment was returned charging the defendants with racketeering under the Racketeer Influenced and Corrupt Organizations Act [RICO], 18 U.S.C. § 1962(c) (1976)[1] and with various narcotics violations under 21 U.S.C. §§ 2, 841, 846 (1976).[2]

After Dino D'Agostino, a fifth defendant, pleaded guilty, the remaining four defendants proceeded to trial on the following counts. Count one (RICO) charged that Ponticelli and DeRosa's association constituted a racketeering enterprise, as defined in 18 U.S.C. § 1961(4) (1976),[3] which engaged in a pattern of narcotics violations (counts two through nine) and which further engaged in attempts to collect payments in exchange for permission to deal narcotics in Los Angeles and for protection of those dealings in violation of § 846. Count one charged that DeSantis and Bertman associated with the Ponticelli-DeRosa narcotics enterprise, and participated in the affairs of that enterprise through a pattern

of racketeering acts (narcotics violations charged in counts five, seven, and eight). Counts two through nine charged various combinations of the defendants with distributing and attempting to distribute narcotics.[4]

On motion for acquittal following the presentation of the government's case, the trial judge dismissed defendants DeSantis and Bertman from the RICO count. The jury convicted all four defendants on all the remaining counts.[5]

On appeal, the defendants contend that the evidence presented was insufficient to sustain their convictions on each of the counts. The defendants also raise issues relating to the validity of the indictment, the right to cross-examination, the adequacy of counsel, and the propriety of the government's joinder of all defendants in one trial. We reject each claim.

## I

### SUFFICIENCY OF THE EVIDENCE

In considering a claim of insufficient evidence, we must determine whether "after viewing the evidence in the light most

---

1. Section 1962(c) provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

2. Section 841(a) states in pertinent part: "Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally ... (1) to ... distribute ... a controlled substance ...."

 Section 846 makes it an offense to conspire to commit any offense in the subchapter.

 Section 2 makes it an offense to aid and abet the commission of an offense against the United States.

3. Section 1961(4) defines "enterprise" as: "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

4. Counts two, three, and four charged Ponticelli and D'Agostino with distributing cocaine on three separate occasions. Count five charged DeRosa, Ponticelli and DeSantis with distribut-

ing cocaine on October 31, 1978. Count six charged DeRosa and Ponticelli with distributing oxycodone, a controlled substance, on November 29, 1978. Count seven charged DeRosa, Ponticelli and DeSantis with the attempted distribution of cocaine on February 6, 1979. Count eight charged DeRosa, Ponticelli and Bertman with conspiring to distribute heroin between January 1979 and April 1979. Count nine charged DeRosa and Esposito, an unindicted co-conspirator, with conspiring to distribute heroin between March 1979 and April 1979.

5. DeRosa was sentenced to ten years on each of counts one, five, seven, eight and nine and to five years for count six, the sentences to run concurrently.

 Ponticelli was sentenced to eight years on each of counts one, two, three, four, five, seven and eight and to five years on count six, the sentences to run concurrently.

 DeSantis was sentenced to two years on each of counts five and seven, the sentences to run concurrently.

 Bertman was sentenced to two years on count eight.

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

### A. Counts Two, Three, Four, and Six

■ Ponticelli challenges the sufficiency of the evidence presented on counts two, three, and four, which charged him and Dino D'Agostino (the defendant who pleaded out) with distribution of cocaine on three separate occasions, and count six, which charged Ponticelli and DeRosa with distribution of oxycodone, a controlled substance. Ponticelli asserts that at no time did he physically possess the drugs in question and that he was merely present with DeRosa and D'Agostino when the narcotics distributions occurred.

The evidence, however, when viewed in the light most favorable to the government, shows that Ponticelli's involvement went far beyond his mere presence at the narcotics transactions. The evidence indicates that he arranged the meeting in which the count two cocaine distribution occurred, provided informant Blinder with the drug connection, directed and oversaw the distribution of the cocaine, and negotiated the price of the transaction. For counts three and four, the evidence shows that Ponticelli also arranged the meeting in which the cocaine sale occurred, directly negotiated the amounts, prices and methods of payment, and received the purchase money. With respect to count six, the record indicates that Ponticelli was present during the oxycodone transaction and encouraged Blinder to buy the pills, told Blinder that they would be easy to sell on the street, and oversaw the exchange of purchase money. In sum, the evidence is clearly sufficient to sustain Ponticelli's conviction on counts two, three, four, and six.

### B. Count Five

■ DeSantis challenges the sufficiency of the evidence presented on count five which charged him with distributing a small bottle of cocaine. At trial it was established that DeRosa gave the bottle to Blinder who transferred it to DEA Agent Bareng. The only evidence linking the bottle to DeSantis came from Bareng who testified that, during his only encounter with DeSantis, DeSantis admitted after prompting that he had supplied DeRosa with the bottle of cocaine. DeSantis made the remark in the course of an aborted cocaine sale indicating to Agent Bareng that the small bottle of cocaine was a sample of a larger supply.[6]

Viewing DeSantis' statement in the light most favorable to the government, we conclude that it was sufficient for the jury to convict. While DeSantis testified that the incriminating remark was only an empty boast to make himself appear important, the jury was entitled to reject DeSantis' explanation of the incident. *See Anderson v. United States,* 561 F.2d 162, 167 (8th Cir. 1977). Even though the evidence against DeSantis on count five is far from overwhelming, the circumstances of the admission and the fact that DeSantis himself made the incriminating statement was sufficient for the jury to conclude that there was evidence beyond a reasonable doubt that DeSantis was guilty.

■ DeSantis also claims that the bottle was improperly admitted into evidence because it was not authenticated and its chain of custody was not established. This claim is without merit. While informant Blinder testified that he only "believed" that the bottle introduced as a government exhibit was the same bottle he received from DeRosa and delivered to Agent Bareng, Bareng affirmatively testified that the exhibit was the same bottle he received from Blinder. Furthermore, DeSantis' own counsel at trial

---

**6.** Bareng testified that when asked about the quality of the cocaine in the upcoming sale, "Mr. De Santis told me that this was the same cocaine that he gave to [DeRosa], and at this time I said, 'oh, is it the same stuff you gave to [DeRosa] in that, that, that,' and I stalled my sentence, and Mr. De Santis finished the sentence and he said, 'Yes, in the little bottle.'" Reporter's Transcript, vol. VII, at 129.

specifically conceded at side bar to the chain of custody of the exhibit and entered into a general stipulation that there was no issue of chain of custody for any of the exhibits.

## C. *Count Seven*

██ Ponticelli and DeSantis claim that there was insufficient evidence to convict them on count seven, which charged an attempt to distribute cocaine on February 6, 1979. They argue that their behavior on the night in question involved no affirmative steps toward consummation of the crime. "A conviction for attempt requires proof of culpable intent and conduct constituting a substantial step toward commission of the crime that strongly corroborates that intent." *United States v. Snell*, 627 F.2d 186, 187 (9th Cir. 1980), *cert. denied*, 450 U.S. 957, 101 S.Ct. 1416, 67 L.Ed.2d 382 (1981).

In *United States v. Mandujano*, 499 F.2d 370, 371–72 (5th Cir. 1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975), the defendant offered to sell an ounce of heroin for $650 to a government agent, took the proffered purchase money, and went to find his source of heroin. An hour later the defendant returned the money saying that he could not locate his source. The court held this sufficient to constitute an attempt to sell heroin.

The instant case is identical to *Mandujano*. Ponticelli arranged the initial transaction between DeSantis, the alleged supplier, and agent Bareng and informant Blinder. On the day of the planned sale, DeSantis stated that he wanted the cocaine deal to occur at night, and that he wanted advance viewing of the $32,000 payment. DeSantis then went to Bareng's car where he viewed the purchase money. That evening, Bareng and Blinder met Ponticelli at the agreed site. Ponticelli said that he and DeSantis would meet in 30 minutes and that they would return with the cocaine. Ponticelli then went to meet DeSantis at a nearby restaurant. At this time, both defendants were under government surveillance. Upon returning they told Bareng and Blinder that they had observed police surveillance in the area and did not want to complete the narcotics sale that night. The deal was never rescheduled.

The only difference between the instant case and *Mandujano* is that here the defendants did not take possession of the purchase money. However, since they insisted on viewing the money before the sale, the jury could have reasonably concluded that the defendants had proceeded beyond the point of preparation and that they had taken significant steps toward making the illegal cocaine transaction before aborting upon discovery of police surveillance.

## D. *Count Eight*

██ Defendants Ponticelli and Bertman challenge their convictions on count eight, conspiracy to distribute heroin in Hawaii between January and April 1979. Ponticelli contends that DeRosa arranged the Hawaii heroin deal and that there was insufficient evidence to indicate that Ponticelli was connected with the transaction. The evidence is to the contrary. The record shows that Ponticelli suggested, arranged, and directed the entire aborted Hawaii heroin sale.

Bertman's claim is also without merit. The evidence shows that Bertman was in close communication with Ponticelli during the Hawaii incident and attempted to obtain and deliver the heroin to Bareng and Blinder at the behest of Ponticelli and DeRosa. A video tape played to the jury showed Bertman delivering to Blinder and Bareng a sample of the heroin that was to be sold.

Bertman's claim that he was assisting the DEA at the time of the attempted transaction is not credible. Bertman informed the DEA that two persons (Bareng and Blinder) had come to Honolulu to obtain heroin, but he refused to tell the DEA his address. Moreover, the DEA instructed him not to pick up heroin for anyone, and he never contacted the DEA again. The jury could reasonably have believed, as the government urged, that Bertman went to the DEA merely to assure himself that Bareng and Blinder were not undercover agents, a question he asked the DEA repeatedly at their meeting.

### E. *Count Nine*

■ Defendant DeRosa challenges the evidence against him on count nine, charging him with conspiracy to distribute heroin with his unindicted co-conspirator, Mr. Esposito. DeRosa argues that there was no evidence of an agreement between him and Esposito to carry out the heroin transaction. DeRosa relies on *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980) for the proposition that there can be no conspiracy conviction if there is no evidence of an agreement among the co-conspirators to conduct an illegal transaction.

In *Melchor-Lopez*, the government could prove only that the defendants had agreed to discuss a purchase, but not that they had agreed to the actual purchase of a controlled substance. The court reversed the conviction because the defendant steadfastly refused to agree to any transaction unless certain conditions were met. 627 F.2d at 891–92. In the instant case, the evidence shows that DeRosa and Esposito *had* agreed to conduct a $210,000 heroin sale in New York. DeRosa told Bareng, in the presence of Esposito, that he would sell Bareng two kilograms of China White heroin in a New York hotel room. Bareng testified that "Mr. DeRosa told me everything was set and that [DeRosa] and Mr. Esposito had already made reservations and they were ready to go." Reporter's Transcript, vol. VII, at 259. These statements established the agreement between DeRosa and Esposito to sell the heroin.

The heroin deal was not ultimately consummated because there was a "change" in the plans when the New York connection wanted Bareng to advance the purchase money before delivery of the heroin. Bareng objected to this condition and the agreed heroin sale was never completed. Thus, the jury could have reasonably concluded that DeRosa and Esposito had reached an agreement to sell heroin and were frustrated in their efforts only by a change in the terms of the agreement made by the New York source.

## II

### THE RICO COUNT

DeRosa and Ponticelli assert that the RICO statute under which they were convicted is unconstitutionally vague because persons of common intelligence must guess at its meaning and might differ as to its application. *See Connally v. General Construction Co.*, 269 U.S. 385, 390, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). This claim has been rejected not only by this circuit, *United States v. Campanale*, 518 F.2d 352, 364 (9th Cir. 1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976), but also by every other circuit that has considered it, *see, e.g., United States v. Huber*, 603 F.2d 387, 393 (2d Cir. 1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). It merits no further discussion.

■ Relatedly, Ponticelli and DeRosa argue that the indictment, charging both RICO and substantive narcotics offenses, is multiplicious. "Multiplicity consists of charging the same defendant with the same offense in several different counts." *United States v. Bartemio*, 547 F.2d 341, 345 (7th Cir. 1974). The Second Circuit rejected this claim in *United States v. Boylan*, 620 F.2d 359, 360–61 (2d Cir.), *cert. denied*, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980). We reject Ponticelli's and DeRosa's claims for the same reasons expressed by the *Boylan* court.

Ponticelli and DeRosa further contend that the government incorrectly applied the RICO statute against them. The defendants first assert that the trial court erred in ruling that the statutory definition of the term "enterprise" applied to wholly illegitimate as well as legitimate associations. That same contention was rejected by the Supreme Court in *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981).

■ The defendants next assert that the government failed to prove that the "enterprise" had an existence apart from the commission of the predicate acts of racketeering used as the basis of the RICO charge. The Court in *Turkette* stated that a valid

conviction under RICO requires proof of both a pattern of racketeering activity and the existence of an enterprise. However, the Supreme Court went on to say that an enterprise can be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associations function as a continuing unit." 101 S.Ct. at 2528.

In the instant case, the evidence clearly shows an ongoing relationship between Ponticelli and DeRosa for the purpose of selling and distributing narcotics, and sanctioning narcotics distributors. To prove the existence of the RICO enterprise, the government introduced evidence showing a lengthy association between DeRosa and Ponticelli. Both DeRosa and Ponticelli, on a number of occasions, sought to introduce Bareng and Blinder to sources of narcotics located in various parts of the country so that DeRosa and Ponticelli could obtain a percentage of any resulting narcotics transactions. Moreover, DeRosa and Ponticelli demanded payments from Bareng for introductions to narcotics sources and for permission to distribute illegal drugs in Los Angeles. DeRosa also attempted to provide Blinder with a "crew" to facilitate the narcotics distribution. These activities, standing apart from the predicate acts of narcotics distribution charged in counts two through nine, are more than sufficient to establish the existence of a criminal "enterprise" under the *Turkette* definition.

### III

### RIGHT OF CROSS–EXAMINATION

■ Ponticelli claims that he was denied his Sixth Amendment right to cross-examine Bareng because the district court, after an offer of proof, denied his request to call Bareng back from Hawaii for further cross-examination. Agent Bareng was on the stand for two days during which Ponticelli's attorney took full advantage of his opportunity for cross-examination. The questions addressed to Bareng covered a wide range of subjects including the areas in which Ponticelli now claims he was limited. At the time that Bareng was excused, no party requested that he be retained as a witness despite the fact that it was well known by Ponticelli's counsel that Bareng was going to Hawaii. *See Batsell v. United States*, 403 F.2d 395, 401–2 (8th Cir. 1968), *cert. denied*, 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969) (no error for trial court not to recall witness when defense counsel had full opportunity to cross-examine).

### IV

### EFFECTIVE ASSISTANCE OF COUNSEL

■ Ponticelli claims that he was denied effective assistance of counsel at trial because of his counsel's inadequate cross-examination of government witnesses and his failure to call any defense witnesses.[7] The standard for evaluating such a claim is whether an accused received "assistance within the range of competence demanded of attorneys in criminal cases." *Cooper v. Fitzharris*, 586 F.2d 1325, 1329 (9th Cir. 1978), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 793 (1979), *quoting McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). A claim of ineffective counsel based on specific actions or omissions deserves relief only if the errors prejudiced the defense. *Cooper*, 586 F.2d at 1331.

■ Nothing is cited in Ponticelli's brief to indicate any deficiency in cross-examination, and the brief suggests no specific witnesses who might have been called or what they might have said on Ponticelli's behalf. We also note that the trial judge conducted a hearing on the issue of incompetency and concluded that Ponticelli's counsel had provided an adequate defense. A review of the trial record reveals no instances where Ponticelli's defense counsel violated the *Fitz-*

7. Ponticelli's motion to relieve present counsel and to appoint new counsel is DENIED as untimely and without merit. This appeal was argued and submitted on August 6, 1981. The motion to relieve present counsel was not filed herein until October 30, 1981, almost three months after submission.

*harris* standard or prejudiced Ponticelli's case.

## V

## SEVERANCE

### A. *Introduction.*

 At the close of the government's case, the court dismissed the RICO count as to DeSantis and Bertman for failure of proof. Since the RICO count was the sole basis for trying those defendants jointly with Ponticelli and DeRosa, DeSantis and Bertman claimed they were prejudiced by the joint trial and moved for severance both at the close of the government's case and at the end of trial.[8] The district court's denial of these motions is now before us on appeal.[9]

 Under Rule 14 of the Federal Rules of Criminal Procedure, severance may be granted if a defendant's case is prejudiced by the existing joinder.[10] We recognize, as does Rule 14, that joint trials promote judicial economy. In reviewing a district court's decision denying severance, however, we must carefully assess the likelihood and degree of prejudice that joinder created. *See United States v. Brady,* 579 F.2d 1121, 1128 (9th Cir. 1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979).[11]

 When, as here, the count that formed the original basis for joinder is dismissed, the trial court must be "particularly sensitive to the possibility of . . . prejudice." *Schaffer v. United States,* 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921 (1960). In assessing the likelihood that

---

**8.** DeSantis also argues that the trial court erred in denying him a post-indictment preliminary hearing and in denying him access to the grand jury attendance records. The return of a grand jury indictment obviates the need for a preliminary hearing. *See Bayless v. United States,* 381 F.2d 67, 71 (9th Cir. 1967).

DeSantis' second contention ignores the fact that the trial court reviewed the grand jury records *in camera* (thus maintaining the secrecy of the grand jury proceedings) and subsequently denied appellant's motion. Furthermore, our review of the grand jury records indicates no irregularity in grand jury attendance.

**9.** The standard of review is whether the district court abused its discretion in denying the severance motions. *United States v. Donaway,* 447 F.2d 940, 943 (9th Cir. 1971).

**10.** DeSantis also asserts that severance was required after dismissal of the RICO count because the count was not alleged in good faith. *See United States v. Ong,* 541 F.2d 331, 337 (2d Cir. 1976), *cert. denied,* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977). We find ample support in the record for the trial judge's ruling that the government did not act in bad faith in joining DeSantis in the indictment via the RICO Count. *See United States v. Aiken,* 373 F.2d 294, 299 (2d Cir.), *cert. denied,* 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967).

Additionally, DeSantis claims that the initial joinder was improper because the RICO count was based on an incorrect legal theory—e.g., that defendants charged with RICO offenses need not have knowledge of the nature and extent of the enterprise. DeSantis waived this argument by not raising it pre-trial. Fed.R.

Crim.P. 12(f); *United States v. Braunig,* 553 F.2d 777, 780 (2d Cir.), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 277 (1977).

Finally, DeSantis contends that joinder prejudiced his case because the trial judge would not permit DeSantis to argue inferences from the fact that DeSantis took the stand and co-defendants DeRosa and Ponticelli did not. "Unless a defendant can show that his defense probably would have benefited from commenting on a co-defendant's refusal to testify, denial of the motion to sever is not prejudicial." *United States v. De La Cruz Bellinger,* 422 F.2d 723, 727 (9th Cir.), *cert. denied,* 398 U.S. 942, 90 S.Ct. 1860, 26 L.Ed.2d 278 (1970). We are unpersuaded by DeSantis' argument that he would have benefited from the inference and so we hold that the trial judge did not abuse his discretion in denying DeSantis the opportunity to make the inference.

**11.** The hazards of joinder may be magnified when a RICO count was used to establish joinder because there is a risk that "the prejudicial effect of tarring a defendant with the label of 'racketeer' tainted the conviction on an otherwise valid count." *United States v. Guiliano,* 644 F.2d 85, 89 (2d Cir. 1981). Moreover, in attempting to prove a RICO violation, the government will try to show how the various defendants associated as a part of the racketeering enterprise. In this case, however, the RICO count in the jury's copy of the indictment did not mention Bertman or DeSantis, nor did the government argue their relationship to the racketeering enterprise in any prejudicial way. *See infra* text accompanying note 13.

joinder was prejudicial, we examine several factors. Our foremost concern is "whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in the light of its volume and limited admissibility". *Brady*, 579 F.2d at 1128. Additionally, we must consider the complexity of the case, the total weight of the evidence against each defendant, and the effectiveness of the jury instructions. *See id.* Finally, we must be wary of situations where a jury might impute the guilt of some defendants to other defendants. *See United States v. Satterfield*, 548 F.2d 1341, 1346 (9th Cir. 1977).

To aid in the application of these complex standards, we divide the trial evidence into three categories as it relates to the defendant who complains of prejudice from a joint trial: (1) incriminating evidence that would be admissible against the complaining defendant even in a separate trial; (2) incriminating evidence, directly relevant to that defendant's guilt, that would not be admissible in a separate trial, but is admitted at the joint trial with an instruction that it is inadmissible against the complaining defendant; and (3) evidence inadmissible in a separate trial, which does not expressly relate to the guilt of the complaining defendant, but which creates a risk of guilt by association because it incriminates a co-defendant with whom the complaining defendant is associated.

In the case before us, the government's evidence consisted primarily of testimony from Bareng and Blinder, the DEA Agent and informant, respectively, concerning a series of meetings over a three year period relating to four sales of narcotics (counts three, four, six, and eight), two attempted sales (counts seven and nine), and two distributions of narcotics samples (counts two and five) by the defendants to the undercover agents. One of the transactions (count eight) took place in Hawaii, the rest in Southern California. Either Bareng, Blinder, or both, were present at each of

the meetings; either or both DeRosa and Ponticelli were present at nearly all of the meetings. Bertman's participation was limited to the count eight sale in Hawaii, and DeSantis' participation was limited to two meetings on the day of the count seven attempted sale.[12] It was during the first count seven meeting that DeSantis acknowledged responsibility for supplying the count five sample of cocaine which Blinder received from Ponticelli and DeRosa three months earlier.

### B. *Bertman.*

■ All of the evidence detailing Bertman's involvement in the Hawaii deal would have been admissible in a separate trial. In addition to Bareng and Blinder's testimony about Bertman's involvement in the Hawaii deal, the government produced a video tape of Bertman's delivering a sample of heroin and stating that he would be a constant supplier of heroin to Bareng and Blinder. There was admissible testimony as well relating to several meetings between Bertman and Bareng, in which Bertman made arrangements for the misfired heroin transaction and confirmed that he had been in close communication with Ponticelli concerning the upcoming heroin sale.

With one exception, none of the evidence that the jury was told not to use against Bertman, such as evidence relating to the Southern California meetings and transactions, contained any specific reference to Bertman. The only exception was an isolated comment by DeRosa to Bareng that Bertman could supply heroin in Hawaii. Accordingly, the risk that Bertman was prejudiced by that evidence was slight.

This leaves only the possibility that Bertman was prejudiced by the extensive testimony against DeRosa and Ponticelli on counts one through seven and nine, which was irrelevant to Bertman's guilt on count eight. That evidence, which would never be known to the jury in a separate trial, implicitly connected Bertman to a widespread drug-trafficking syndicate headed by DeRosa and Ponticelli. Thus, the evi-

---

12. DeSantis also participated in a few inconsequential meetings over the next two months, unrelated to any particular transaction.

dence had the potential for influencing the jury to find Bertman guilty by association. Because almost all the evidence referring to Bertman related to a short time period in Hawaii, however, the jury could easily compartmentalize the evidence against Bertman, and should have had no trouble following the trial judge's instruction to disregard evidence inadmissible against Bertman in considering his guilt or innocence.[13] We emphasize that the judge guided the jury throughout the trial with exemplary instructions, and, during closing arguments, the prosecutor and defense counsel effectively sorted out the evidence against each defendant.

We conclude that because Bertman's Hawaii meetings involved discrete, simple transactions that the jury could readily distinguish from all the other defendants' dealings, and because the admissible evidence against Bertman was so compelling, the possibility that Bertman's conviction resulted from guilt by association with DeRosa and Ponticelli is remote.[14] The district court did not abuse its discretion in denying Bertman's motion for severance.

### C. DeSantis.

██ Our analysis of the evidence relating to DeSantis parallels our analysis in Bertman's case.

As for the count seven charge, DeSantis concedes that he "appeared" to attempt to sell a pound of cocaine to Bareng and Blinder. The deal fell through when DeSantis returned empty-handed from a supposed rendezvous with his source and complained of police surveillance. DeSantis claims that he had no intention of selling cocaine, and that, as far as he knew, the count seven episode was "a scam set up in order to obtain money from [Bareng and Blinder]." Reporter's Transcript, vol. XI, at 1131.

As for the count five charge, the only admissible evidence tending to show that DeSantis supplied the sample of cocaine that Blinder received from Ponticelli and DeRosa in October 1978 was DeSantis' alleged admission to Bareng three months later during the count seven discussions. DeSantis contends that his admission was merely part of the "scam," and that he had no knowledge of the count five cocaine.[15]

On the inadmissible side, the jury heard Blinder testify that, four days before the count seven meetings, DeRosa identified the source of the count five bottle of cocaine as "D." Id., vol. IX, at 536. While the prosecution implied a connection between "D" and DeSantis during its opening statement, see id., vol. VII, at 31 (prosecutor mentions reference to "D," and in next paragraph introduces DeSantis), it never relied on this reference to implicate DeSantis during closing argument.

DeSantis' name came up in testimony only one other time. Agent Bareng testified that a month after the count seven attempted sale fell through, Bareng asked DeRosa about purchasing a pound of cocaine from DeSantis. DeRosa answered that the count seven cocaine had already been sold but he would "try to work up a deal with Mr. DeSantis." Reporter's Transcript, vol. VII, at 215. The district court ruled the statement inadmissible against DeSantis. Aside from being merely an isolated reference, the statement could not have seriously prejudiced DeSantis' case. According to DeSantis' own defense, DeRosa and Ponticelli portrayed DeSantis to Bareng and Blinder as a viable source of cocaine.

---

**13.** We must presume that the jury followed the judge's instructions. United States v. Escalante, 637 F.2d 1197, 1202 (9th Cir.), cert. denied, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

**14.** This is not to say that a defendant with a "limited role" in his co-defendants' activities can never prove prejudice from joinder. See United States v. Polizzi, 500 F.2d 856 at 902, n.11. We must, however, recognize the difference between a defendant whose role is limited to one or two of his co-defendants' many trans-

actions and a defendant with a limited role in each of a number of transactions or incidents. Bertman typifies the former type of "limited role," where the risk of prejudice is likely to be less.

**15.** See supra note 6. DeSantis testified that he neither initially admitted to supplying the count five sample nor initially mentioned "the bottle," but that he merely answered affirmatively to Bareng's inquiry. Id., vol. X, at 1017.

Apart from these inconsequential references to DeSantis, one indirect, the other direct, the only possible prejudice in the joint trial would have come from the third category of evidence, which detailed DeRosa's and Ponticelli's major drug-selling syndicate. We find that the risk of such prejudice was insubstantial.

The government presented convincing evidence of DeSantis' guilt, including his own admission about the count five sample and his participation in the count seven affair. The government based its case against DeSantis only on evidence admissible against him, and never attempted to tarnish DeSantis' credibility by relying on the evidence of DeRosa and Ponticelli's guilt. DeSantis' rebuttal was a preposterous story about a scheme to obtain money from Bareng and Blinder by posing as a supplier of cocaine.[16] We think that the jury could fairly evaluate the evidence in light of the judge's careful instructions. We thus conclude that the district court did not abuse its discretion in denying DeSantis' severance motion.

AFFIRMED.

---

**16.** DeSantis' own counsel described DeSantis' asserted "scam" as a "preposterous, ridiculous scheme." Reporter's Transcript, vol. XII, at 1381 (closing argument). It is certainly hard to understand how DeSantis could have believed that the purported "scam" would produce a payoff without ever actually delivering drugs to Bareng and Blinder.