UNITED STATES of America, Appellee,

v.

Vito LoRUSSO and Joseph Errante, Defendants-Appellants.

Nos. 83, 84, Dockets 82–1082, 82–1096.

United States Court of Appeals, Second Circuit.

Argued Aug. 31, 1982.

Decided Dec. 2, 1982.

Certiorari Denied April 4, 1983. See 103 S.Ct. 1525.

Philip Le B. Douglas, Asst. U.S. Atty., New York City (John S. Martin, Jr., U.S. Atty. for the S.D. of N.Y., Roanne L. Mann, Asst. U.S. Atty., New York City, on the brief), for appellee.

Michael Pollack, New York City (Edward Gasthalter, John L. Pollok, New York City, on the brief), for defendant-appellant Errante.

J. Jeffrey Weisenfeld, New York City (Goldberger, Feldman, Dubin & Weisenfeld, P.C., New York City, on the brief), for defendant-appellant LoRusso.

Before KEARSE, CARDAMONE, and WINTER, Circuit Judges.

KEARSE, Circuit Judge:

Joseph Errante and Vito LoRusso appeal from judgments entered after a jury trial in the United States District Court for the Southern District of New York, Thomas P. Griesa, *Judge,* convicting them of possession of heroin in violation of 21 U.S.C. § 844 (1976), and of conspiring to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846 (1976). Errante was sentenced to concurrent terms of imprisonment of five years on the conspiracy count and one year on the possession count. LoRusso was sentenced to concurrent terms of imprisonment of two years on the conspiracy count and one year on the possession count.

We affirm the convictions.

## I. FACTS

### A. *Events Leading to the Prosecution*

The case arises out of an undercover operation by the United States Drug Enforcement Agency ("DEA"), conducted by DEA Special Agent John A. Costanzo, who was regularly stationed in Milan, Italy. Costanzo was assisted by a confidential informant employed by the DEA and identified only as "Mimmo." According to the trial testimony of Costanzo and Mimmo, the operation had its genesis in a dinner attended by Costanzo and Mimmo in September 1980 at the Santa Lucia restaurant in the Little Italy section of Manhattan. At the dinner, Mimmo introduced Costanzo to LoRusso, the proprietor of the Santa Lucia.

In January 1981, after Mimmo and Costanzo had returned to Milan, Mimmo telephoned LoRusso to chat. LoRusso stated that he had been trying to contact Mimmo because a friend of LoRusso wanted to arrange a million-dollar purchase of heroin. After a number of additional telephone calls, LoRusso flew to Rome in the company of Errante on January 24; they were met at the airport by Mimmo and Costanzo. LoRusso introduced Errante and, outside of Errante's hearing, vouched for him despite Costanzo's comment that Errante was wearing "big black shoes" such as policemen wear.

The four men eventually went to a restaurant, where Errante stated that he was interested in procuring heroin as a representative of some people in New York who were trying to start a small family for the distribution of heroin. The ensuing conversation concerned amounts, price, delivery, and the testing of a sample to determine the purity of the heroin. LoRusso participated in the conversation. Later that day, the four met again, and tentatively agreed

on the sale of ten kilograms of heroin, for which Errante proposed to pay the New York market price prevailing at the time of delivery. At that time Errante stated that since everything had been resolved, he would return to New York the following day to consult with his people. Errante asked LoRusso, who was not returning to New York with Errante, to telephone him on January 28 to learn what Errante's people had decided. LoRusso said he would do so and that he would then telephone Mimmo with the information. On January 28, LoRusso telephoned Mimmo and reported that Errante's family were in accord with what had been agreed.

On February 5, 1981, Mimmo and Costanzo arrived in New York to attempt to conclude the sale. Matters did not proceed smoothly. On February 7, Costanzo and Mimmo met with LoRusso and Errante, and Costanzo stated that the price of the ten kilos of heroin would be $120,000 per kilo. Errante stated that he would have to check the price with the people above him, and the four men agreed to meet again the next day. At this point, however, LoRusso commenced to question Errante's bona fides and suggested that Errante might be a policeman. Costanzo stalked away in irritation after pointing out that LoRusso had brought Errante to Rome to introduce him and had vouched for him; and a loud argument erupted between LoRusso and Errante.

Despite their argument, LoRusso and Errante appeared together the next day for the scheduled meeting with Mimmo and Costanzo. At that meeting, it was agreed that the price of the heroin would be $120,000 per kilogram, but Errante stated that his people would not buy all ten kilos at once and preferred to buy one kilo at a time. Costanzo suggested a compromise of five kilos, but no agreement was reached. It was agreed, however, that when an amount was settled on, deliveries would take place in the following way: Errante and an associate would bring the money to the Santa Lucia, where Mimmo and Costanzo would count it and check its genuineness; Errante and Costanzo would then go to

where the heroin was stored and Errante would have it tested; Mimmo and Errante's associate would remain at the restaurant with the money; if the heroin was of satisfactory quality, Errante would speak to his associate at the Santa Lucia and instruct him to allow Mimmo to leave with the money while Errante took possession of the heroin. At this February 8 meeting, LoRusso again speculated that Errante might be a policeman.

That evening, when Mimmo went to the Santa Lucia, he found Errante and LoRusso arguing about LoRusso's suspicions. Errante suggested that they settle the matter by speaking to Errante's people, and he and LoRusso left the restaurant. LoRusso later returned alone and told Mimmo that the man they had gone to see, referred to only as "Mike," had not been available.

On February 9 at the Santa Lucia, Costanzo and Errante agreed to the sale of one kilogram of heroin and arranged for delivery of a sample for testing. Costanzo informed Mimmo and LoRusso of the arrangements. LoRusso repeated his suspicion that Errante was a policeman, but also expressed concern that in the delivery procedures, Errante might attempt to take the heroin and keep the money. LoRusso suggested that he be allowed to remove the money to another restaurant or to take it to the cellar of the Santa Lucia whence he could escape. Costanzo and Mimmo became angry with LoRusso and told him that they did not wish to have anything further to do with him.

That evening, however, when Mimmo returned to the restaurant, LoRusso said that he had managed to contact "Mike" and indicated that his suspicions of Errante had been allayed, saying there would be no further problem. Mimmo then told LoRusso that LoRusso could attend the next day's meeting, at which the sample would be delivered.

On February 10, in the presence of LoRusso and Mimmo in LoRusso's car, Costanzo gave Errante a sample of heroin to be tested by Errante's chemist. Although the

test would have required only a small fraction of one gram, Costanzo gave Errante three grams, which had a retail value of approximately $6,000. Errante told LoRusso to call him later to learn the results of the test. LoRusso thereafter duly telephoned Errante and then informed Mimmo that the delivery could go forward the next day.

On February 11, however, when Costanzo and another DEA agent met Errante and LoRusso at the Santa Lucia, Errante demanded that the heroin be supplied in advance of payment. At this point Costanzo refused to pursue the deal and he and his partner left the restaurant.

Costanzo made two unsuccessful efforts to revive the transaction. First, he had Mimmo telephone LoRusso immediately, and Mimmo and LoRusso met privately that evening. LoRusso complained to Mimmo that Costanzo should not have brought his companion to the meeting earlier that day, since the companion was a stranger to Lo-Russo. He also suggested that Costanzo should have agreed to deliver the heroin on consignment, and asked whether there was a way the deal could be revived. This conversation was interrupted without any resolution of the matter. Mimmo's second attempt took place on February 26, after he had returned to Milan. Mimmo telephoned LoRusso and stated that Costanzo was now willing to supply the heroin in advance of payment, and asked whether LoRusso could contact Errante. LoRusso replied that Errante did not want to know anything more, that LoRusso had not seen him for two weeks, and that Errante had instructed him

to "tear everything," including Errante's phone number.

### B. The Indictment and the Proceedings During Trial

Errante and LoRusso were arrested in September 1981 and were indicted on two counts. Count 1 charged them with conspiring with each other and with other persons unknown to the grand jury to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846. Count 2 charged each defendant with possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A). At trial the government's principal witnesses were Costanzo and Mimmo, who testified to the events described above. Neither defendant testified.

At the close of the government's case, the defendants moved pursuant to Fed.R. Crim.P. 29(a) for judgments of acquittal as to count 2 on the ground that the evidence was insufficient to establish beyond a reasonable doubt that they had intended to distribute the heroin in their possession.[1] The trial court orally granted the motions, stating that the proof of intent to distribute was "entirely speculative and Count 2 is dismissed." (Tr. 733.)

The government immediately moved pursuant to Fed.R.Crim.P. 31(c) to have the court submit a charge of simple possession, without intent to distribute, in violation of 21 U.S.C. § 844, to the jury as a lesser-included offense within count 2. The colloquy, beginning with the court's dismissal of the original count 2, was as follows:

---

1. Fed.R.Crim.P. 29(a) provides, in pertinent part, as follows:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

The government advanced two arguments to support its contention that intent had been proven. First, it contended that Errante's transfer of heroin to a chemist would have been a distribution (a proposition with which

the court disagreed), and argued that Errante's statements that he would have a chemist test the heroin therefore proved intent to distribute. Second, the government contended that since only a small portion of the three grams of heroin given to Errante was needed for testing, it would "def[y] all common sense" to believe the defendants would not distribute the excess amount. (Tr. 731.) The defendants argued that since the government controlled the size of the sample, it would be unfair for the government to be able to prove, merely from the availability of the excess, that distribution was intended.

THE COURT: I think it is entirely speculative and Count 2 is dismissed.

MR. DOUGLAS [Assistant United States Attorney]: We would then move pursuant to 31(c) to have Count 2 considered under the lesser included offense. 31(c) was passed specifically to give the government an opportunity to still go to the jury even if its proof falls short of the greater offense if there is a logical reason to find the defendants guilty of the lesser included offense.

THE COURT: What is the lesser included offense?

MR. DOUGLAS: Simple possession without intent to distribute.

(Tr. 733.) Defendants objected on the ground that submission of the charge of simple possession would be improper under Rule 31(c) in light of the court's action on the original count 2, and that submission of the reduced count would constitute an impermissible variance in the indictment. The court gave both sides until the next day to present arguments.

In the argument on the government's motion, defendants adhered to their initial objections and argued in addition that, since "[a] judgment of acquittal has been entered," (Tr. 771), such a submission would violate their rights under the Double Jeopardy Clause of the Constitution. The trial judge rejected this argument, pointing out that judgments had not in fact been entered, and granted the government's motion, as reflected in the following colloquy:

THE COURT: ... I think the double jeopardy argument is not a profitable line of inquiry.

MR. SOROKA [Counsel for LoRusso]: I am giving you that reasoning because the record of this case is that a judgment of acquittal was entered.

THE COURT: No, a judgment of acquittal hasn't been entered. I have granted a motion.

MR. SOROKA: Pursuant to Rule 29 for a judgment of acquittal.

MR. DOUGLAS: The judgment was never entered.

THE COURT: Look, the trial is still going on. The motion was granted. I could reconsider the motion if I wanted to and it wouldn't be double jeopardy. The government could move for reargument. (Tr. 776–77.)

Accordingly, the court agreed to submit count 2 to the jury as a charge of simple possession. The jury convicted both Errante and LoRusso on count 1 and on count 2 as reduced.

## II. DISCUSSION

On appeal, Errante and LoRusso challenge their convictions on a number of grounds.[2] They argue principally that the trial court's submission of a reduced count 2 to the jury, after granting their motions to dismiss the original count 2, was unauthorized and subjected them to double jeopardy, and that the evidence was insufficient to convict them of conspiracy as charged in count 1. Finding no merit in any of their contentions, we affirm.

### A. Submission to the Jury of Reduced Count 2

Defendants renew on appeal their objections to the trial court's decision to submit

---

2. LoRusso also challenges his sentence on the ground that no evidentiary hearing was held on his challenges to the contents of his presentence report. We find no error. The procedure to be followed in entertaining challenges to presentence reports lies within the discretion of the sentencing judge, *United States v. Needles,* 472 F.2d 652, 658 (2d Cir.1973), who should adopt a procedure that will "permit that presentation by the defendant which will enable the sentencing judge to grasp the relevant facts correctly." *United States v. Robin,* 545 F.2d 775, 779 (2d Cir.1976). Here an adequate amount of time was allowed for LoRusso's re-view of the report, and his counsel submitted to the sentencing court two letters presenting LoRusso's explanations of certain matters described in the report. The sentencing judge had discretion to determine whether these submissions should be pursued in an evidentiary hearing, and his decision not to hold such a hearing was not an abuse of discretion. There being no indication that LoRusso's sentence was based on incorrect information, the sentence is not reviewable. *E.g., United States v. Tramunti,* 513 F.2d 1087, 1120 (2d Cir.), *cert. denied,* 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975).

to the jury a charge of simple possession of heroin, without intent to distribute, as a lesser offense included within the original count 2, *viz.,* possession with intent to distribute. They contend that the modification of count 2 by the court constituted an impermissible variance in the indictment handed down by the grand jury; that the court had no power to submit an uncharged lesser-included offense to the jury without also submitting the greater offense; that since the court had dismissed count 2, it no longer had the power to submit the lesser-included offense; and that even if the power existed, submission of the reduced count after dismissal of the greater offense violated their rights not to be subjected to double jeopardy. We find no merit in any of these contentions.

1. *Power To Submit Reduced Charge: Rule 31(c)*

█ The decision of the district court to submit the reduced count 2 to the jury was well within the court's authority. Fed. R.Crim.P. 31(c) provides that "[t]he defendant may be found guilty of an offense necessarily included in the offense charged . . . ," *i.e.,* a lesser-included offense.[3] The trial judge may implement Rule 31(c) in a number of ways. He may instruct the jury that it may find the defendant guilty of either the greater or the lesser-included offense. *See United States v. Giampino,* 680 F.2d 898 (2d Cir.1982). If the jury returns a verdict of guilty on the greater offense, the judge may enter a judgment of guilty on the lesser offense alone. *Virgin Islands*

*v. Josiah,* 641 F.2d 1103, 1108 (3d Cir.1981); *cf. United States v. Swiderski,* 548 F.2d 445, 452 (2d Cir.1977). Or, prior to submitting the case to the jury, the trial judge may decide to give effect to the provisions of both Rule 31(c) and Rule 29(a), *see* note 1 *supra,* and submit to the jury only the lesser offense if he has determined that the evidence is insufficient to establish beyond a reasonable doubt that element of the greater offense which is not an element of the lesser offense. *United States v. Blackwell,* 515 F.2d 125, 126–27 (4th Cir.1975) (per curiam). The last described method was that adopted here.

█ We are unpersuaded by the defendants' contention that the trial court's power in the present case to submit the lesser-included offense pursuant to Rule 31(c) was extinguished by the court's oral announcement that it was dismissing count 2 on defendants' motions pursuant to Rule 29 for judgments of acquittal. Although Rule 31(c) would have had no application if there were no pending charge under count 2, that was not the circumstance here. The court's oral granting of defendants' motions for acquittal on count 2 was no more than an interlocutory order, and count 2 remained pending since no judgment had been entered pursuant to Fed.R.Crim.P. 32(b)(1). While the Federal Rules of Criminal Procedure contain no explicit provisions granting the court authority to modify or rescind its orders before a judgment has been entered, Rule 2 states that "[t]hese rules are intended to provide for the just determination of every criminal proceeding," and Rule 57(b)

**3.** An uncharged offense is a lesser-included offense if it is composed of fewer than all of the elements of the offense charged, and if all of its elements are elements of the offense charged. *United States v. Giampino,* 680 F.2d 898, 901 (2d Cir.1982). Because all the elements of a lesser-included offense are by definition comprised within the greater offense, the grand jury in charging the greater has also charged the lesser. The submission, therefore, of the lesser offense is within the scope of the indictment. *United States v. Blackwell,* 515 F.2d 125 (4th Cir.1975) (per curiam).

The primary purpose of the lesser-included-offense rule is "to aid the prosecution when it has failed to prove all of the elements of the offense charged in the indictment." *United States v. Giampino, supra,* 680 F.2d at 900 n.1. There is no question that the crime of simple possession, in violation of § 844, is lesser than and wholly included within the crime of possession with intent to distribute, in violation of §§ 812, 841(a)(1), and 841(b)(1)(A). Since there was dispute as to establishment of intent to distribute, *i.e.,* the element required for proof of the greater, but not the lesser, offense, a lesser-included-offense charge was required if either party requested it. *See Sansone v. United States,* 380 U.S. 343, 350, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965); *United States v. Giampino, supra.*

provides that "[i]f no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute." A district court has the inherent power to reconsider and modify its interlocutory orders prior to the entry of judgment, whether they be oral, *e.g., United States v. Green,* 414 F.2d 1174, 1175 (D.C.Cir.1969) (trial judge had authority to withdraw oral decision granting defendant's motion to dismiss indictment), or written, *e.g., United States v. Jerry,* 487 F.2d 600, 604–05 (3d Cir.1973) (district court had authority to rescind written order improvidently permitting defendant to withdraw guilty plea); *cf. United States v. Benz,* 282 U.S. 304, 306–07, 51 S.Ct. 113, 114, 75 L.Ed. 354 (1931) (stating general rule that judgments, decrees, and orders in civil or criminal cases may be modified by court within the term in which they were entered), and there is no provision in the rules or any statute that is inconsistent with this power. As the court in *United States v. Jerry* stated,

> [n]othing in the Rules limits the power of the court to correct mistakes made in its handling of a case so long as the court's jurisdiction continues, i.e., until the entry of judgment. In short, the power to grant relief from erroneous interlocutory orders, exercised in justice and good conscience, has long been recognized as within the plenary power of courts until entry of final judgment and is not inconsistent with any of the Rules.

487 F.2d at 604. Thus,

> whether the case *sub judice* be civil or criminal[,] so long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so.

*Id.* at 605.

We conclude that the action of the trial court here in promptly deciding to submit a reduced count 2 to the jury, thereby modifying its oral decision to dismiss count 2 entirely, was well within the court's authority and was properly designed to ensure the just determination of the charges brought against these defendants.

### 2. The Claim of Double Jeopardy

Notwithstanding the trial court's authority under the rules and its inherent power to modify its interlocutory decisions, a change in decision would be impermissible if it violated a defendant's constitutional right not to be placed twice in jeopardy for the same offense. We find no such constitutional violation here.

 The Double Jeopardy Clause provides three fundamental protections:

> "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishment for the same offense."

*United States v. Wilson,* 420 U.S. 332, 343, 95 S.Ct. 1013, 1021, 43 L.Ed.2d 232 (1975) (quoting *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)). The phrase "the same offense" encompasses both the offense charged and any lesser offense necessarily included therein. Thus an acquittal of a greater offense precludes a subsequent prosecution for a lesser-included offense. *See United States v. Ball,* 163 U.S. 662, 670, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896). The principle underlying the Double Jeopardy Clause

> is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

 These protections have been viewed in a commonsense fashion, and "where there is no threat of either multiple punishment or successive prosecutions, the Double Jeopardy Clause is not offended." *United States v. Wilson, supra,* 420 U.S. at 344, 95

S.Ct. at 1022 (footnote omitted). For example, although the right of the government to appeal an adverse judgment in a criminal case is quite limited, see, e.g., id. at 352, 95 S.Ct. at 1026; *United States v. Sanges,* 144 U.S. 310, 12 S.Ct. 609, 36 L.Ed.2d 445 (1892), a statutorily authorized appeal by the government is constitutionally permissible if a reversal will not require that the defendant be tried a second time:

> Although review of any ruling of law discharging a defendant obviously enhances the likelihood of conviction and subjects him to continuing expense and anxiety, a defendant has no legitimate claim to benefit from an error of law when that error could be corrected without subjecting him to a second trial before a second trier of fact.

*United States v. Wilson, supra,* 420 U.S. at 345, 95 S.Ct. at 1022. Inversely,

> [a] judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict, may not be appealed and terminates the prosecution when a second trial would be necessitated by a reversal.

*United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 2193, 57 L.Ed.2d 65 (1978).

By parity of reasoning, we see no reason why the trial court in the present case was not free before the entry of judgment to amend its own ruling since it did so without subjecting the defendants to a second trial.[4] Normally a judgment of acquittal of a charge, entered prior to verdict on the ground that the evidence was insufficient, would terminate the prosecution on that charge and bar retrial of the defendant on that, or any lesser-included, charge. Where no judgment has been entered, however, and there has been no dismissal of the jury (nor any indication to the jury of a ruling that could prejudice the defendant on such counts as are eventually submitted), there appears to be no constitutional impediment

to the court's modification of its oral decision to dismiss the original count.

We do not suggest that entry of a judgment pursuant to Rule 32(b)(1) is a prerequisite to the termination of the prosecution for double jeopardy purposes. "[A] verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offense." *United States v. Ball, supra,* 163 U.S. at 671, 16 S.Ct. at 1195. And had the jury been dismissed following the court's oral decision, the absence of a judgment would have been irrelevant to the constitutional issue. Rather, we advert to the absence of a judgment merely to emphasize the inchoate nature of the oral decision seized on by the defendants. *Cf. United States v. Chinchic,* 655 F.2d 547, 549–50 (4th Cir.1981) (jury's initial verdict of acquittal, which was not fully announced in open court, was merely preliminary and not binding on the jury; consequently, retrial of defendant after a change in juror vote resulted in deadlocked jury did not constitute double jeopardy). In the circumstances of this case, where the court's oral decision was followed promptly by the modification providing for the reduction instead of the elimination of count 2, and where the reduced count could be, and was, submitted in the normal course of the trial to the original jury, we conclude that the action of the trial court did not violate principles of double jeopardy.

B. *Sufficiency of the Evidence of Conspiracy*

Defendants assert two principal grounds for their contention that the evidence at trial was insufficient to convict them of conspiracy to distribute and possess with intent to distribute heroin. First they argue that LoRusso's suspicion that Errante was a police officer and his quarrels with Errante tended to show that there was never any agreement between Errante and LoRusso. In addition they argue that the

---

**4.** We do not suggest that in the present case the government could have appealed the trial court's dismissal of count 2, had the dismissal terminated the prosecution on that count, since

a reversal would have mandated a second trial. *United States v. Scott, supra,* 437 U.S. at 91, 98 S.Ct. at 2193.

evidence failed to show that their interest in heroin ripened into any actual agreement to possess and distribute.[5] Defendants' contentions are without merit.

Viewing the evidence, as we must, in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we find that evidence an adequate basis for a reasonable juror to conclude that, despite expressions by LoRusso of mistrust of Errante, there was an agreement between LoRusso and Errante. The evidence showed, among other things, that LoRusso initiated with Mimmo the notion that LoRusso's friend wanted to make a million-dollar purchase of heroin; that LoRusso and Errante then traveled together to Rome, where LoRusso introduced Errante to Mimmo and Costanzo and vouched for Errante in the face of Costanzo's reference to Errante's wearing policeman-style shoes; that LoRusso actively participated in the discussions of the terms of the proposed sale of heroin; that LoRusso reported to Mimmo that Errante's people had approved the deal. These events, which the evidence indicates preceded LoRusso's expressions of mistrust, were sufficient to show an agreement between Errante and LoRusso.

Moreover, the jury was hardly compelled to view LoRusso's expressions of mistrust as an indication that LoRusso abandoned his agreement with Errante. There was no hiatus in LoRusso's participation. He continued to accompany Errante to meetings while voicing mistrust. And after telling Mimmo that his suspicions of Errante had been allayed[6]—two days after

---

5. Errante also argues that if there was a conspiracy he withdrew from it and that his withdrawal should, as recommended by the Model Penal Code, be a defense to count 1. We reject this argument. We have never viewed withdrawal from a conspiracy as a defense to a conspiracy count directed at the period prior to withdrawal, and we decline to do so here. Moreover, even Model Penal Code § 5.03(6) (Proposed Official Draft, July 30, 1962) would allow a withdrawal defense only if the defendant "thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose." The record here reveals that the transaction fell through on February 11 not because of any renunciation by Errante of his criminal purpose, but because he wanted possession of the heroin before paying the purchase price. And LoRusso's statement to Mimmo on February 26 that Errante did not "want to do anything anymore" and had had LoRusso tear up Errante's telephone number, did not suggest that Errante ever renounced the plans of "his people" (*see* note 8 *infra*) to purchase and distribute heroin.

6. LoRusso points out that as to a number of his statements, such as this one and those in the initial telephone conversation with Mimmo, the only evidence was the testimony of Mimmo, and he claims that the trial judge abused his discretion by declining to charge the jury that the testimony of Mimmo, as an informer, "must be examined and weighed by the jury with greater care than the testimony of other witnesses." We disagree. Although we have frequently encouraged the trial courts to instruct juries to scrutinize an informer's testimony with great care, *see, e.g., United States v.*

*Swiderski,* 539 F.2d 854, 860 (2d Cir.1976) (reversing on other grounds), the charge is not required "unless substantial prejudice results from its omission." *United States v. Abrams,* 427 F.2d 86, 90–91 (2d Cir.), *cert. denied,* 400 U.S. 832, 91 S.Ct. 64, 27 L.Ed.2d 63 (1970). In *Swiderski,* for example, in which a defense of entrapment was asserted, the paid informer, who operated on a contingent fee basis and who was apprehensive that he himself might be prosecuted, testified that the defendant had initiated the transaction. This testimony was uncorroborated, and special instruction was warranted. 539 F.2d at 860. Prejudice is not likely to occur, however, where the informer has no especial self-interest to protect and his testimony is largely or wholly corroborated. In the present case, Mimmo's testimony was corroborated by that of Agent Costanzo on a number of key points, notably LoRusso's bringing Errante to Rome, where he vouched for Errante, and LoRusso's participation in the receipt of the heroin sample. In addition, many of Mimmo's telephone conversations with LoRusso, as well as the last meeting between the two at which they discussed possible revival of the transaction, were recorded, and the recordings were admitted into evidence. Although these conversations did not make explicit reference to illegal acts, a rational jury could infer from their tenor that LoRusso was an active and willing participant in a conspiracy. Finally, Mimmo himself was not under indictment or threatened with prosecution, and his position with the DEA was "little more than [that of] a salaried employee." (Errante brief on appeal at 3 n.*.) Thus there was little reason to believe that Mimmo was so interested in the outcome of the prosecution that the court was required to give the special instruction.

they had first been voiced—LoRusso participated in the meeting at which the sample heroin was delivered to Errante; he checked with Errante, in accordance with Errante's instructions, and reported to Mimmo that the test results were satisfactory and that the transaction could therefore be consummated; he attended the final meeting between Errante and Costanzo, which was scheduled to culminate in the delivery of a kilo of heroin; and he asked Mimmo that evening if the deal could not be revived.

� Thus, notwithstanding the facts that LoRusso raised questions and argued with Errante about whether Errante might be a policeman, the evidence was ample for the jury to find a conspiracy[7] between LoRusso and Errante.[8]

We likewise reject defendants' contention that the evidence was insufficient to support a finding of conspiracy because "no agreement was ever reached by LoRusso and Errante with each other or with Agent Costanzo as to the place and time of delivery of contraband, the amount to be delivered, or the price to be paid.... [T]here was never an agreement as to a definite plan.... [T]he only inference which can be drawn is that at the start of negotiations there was a general understanding in principle to distribute heroin." (Errante brief

on appeal at 16–17.) The evidence, when viewed in the light most favorable to the government, was adequate for a reasonable juror to conclude that the agreement between Errante and LoRusso was for the actual commission of illicit acts—i.e., possession and distribution of heroin—rather than just the exploration of general principles. While at the start of negotiations there were many details of the transaction to be thrashed out, the evidence was sufficient to support the conclusion that a concrete agreement was reached. Thus, on February 8, Errante and Costanzo agreed on the price of $120,000 per kilogram; and on that date a method of exchanging the money and the heroin was agreed on, subject to satisfactory testing and agreement on quantity. On February 9, Errante and Costanzo agreed on the quantity of one kilogram. On February 10, sample heroin was delivered, tested, and approved; and LoRusso advised Mimmo that delivery could take place the next day. The fact that on February 11 Errante changed one of the conditions previously agreed to by insisting on delivery of the heroin in advance of payment does not undermine the evidence that agreement had been reached pursuant to which one kilogram of heroin was to be delivered on February 11 for a price of $120,000, with stipulated safeguards to ensure that the buyers received what they

7. LoRusso also asserts that the trial court's instructions to the jury on the subject of conspiracy permitted the jury to convict him if it found that he had merely attended meetings whose illegal purpose he knew but in whose purpose he had not joined. There is one sentence of the charge which could be so construed if read in isolation and if read as stating the only circumstances in which a defendant who has attended meetings is innocent of conspiracy. We note, however, that the court charged that in order to convict a defendant of conspiracy the jury "must find that he participated in some way in the furtherance of the scheme *and* that he knew specifically that it was for the distribution of heroin *and* intended that this activity of distributing heroin be carried out." (Tr. 909; emphasis added.) The court's conspiracy charge evoked no objection from LoRusso's counsel, and, viewing the charge as a whole, *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), we find no error.

8. Moreover, the indictment charged the defendants with conspiring not just with each other, but also with others whose identities were unknown to the grand jury. Despite the lack of identification, there was ample evidence that Errante conspired with others. For example, Errante repeatedly referred to "his people," who apparently had to be consulted at every turn. And the delivery arrangements called for one of Errante's associates to test the heroin and another to protect the money. The fact that Errante's associates were not identified is no impediment to his conviction of conspiring with them. *See Rogers v. United States*, 340 U.S. 367, 375, 71 S.Ct. 438, 443, 95 L.Ed. 344 (1951). Since Errante's own statements are by definition not hearsay, Fed.R.Evid. 801(d)(2)(A), those statements were proof of Errante's agreements with others. *See United States v. Artuso*, 618 F.2d 192, 197 (2d Cir.), *cert. denied*, 449 U.S. 861, 101 S.Ct. 164, 66 L.Ed.2d 77 (1980).

were paying for and that the sellers received $120,000 in real money.[9]

From this evidence the jury could have found beyond a reasonable doubt that Errante and LoRusso had agreed to possess and distribute heroin, not merely to consider such acts "in principle."

The judgments of conviction are affirmed.

---

9. *See United States v. DeRosa,* 670 F.2d 889 (9th Cir. 1982). In *DeRosa,* in which a similar transaction failed because of a last-minute insistence by the defendant sellers of heroin that the purchase money be advanced prior to delivery of the heroin, the court found the evidence sufficient to support a finding that an agreement had previously been reached:

> The heroin deal was not ultimately consummated because there was a "change" in the plans when the New York connection wanted [the undercover DEA agent] to advance the purchase money before delivery of the heroin. [The agent] objected to this condition and the agreed heroin sale was never completed. Thus, the jury could have reasonably concluded that [the alleged coconspirators] had reached an agreement to sell heroin and were frustrated in their efforts only by a change in the terms of the agreement made by the New York source.

*Id.* at 895.